OPINION AND JUDGMENT ENTRY
This appeal comes to us from a judgment issued by the Lucas County Court of Common Pleas, Juvenile Division. There, the juvenile court terminated a mother's and father's parental rights to their ten-year-old son and granted permanent custody of the child to a children services agency. Because we conclude that the court's determination that the child could not be placed with either of his parents within a reasonable time or should not be placed with his parents is not supported by the evidence, we reverse.
Appellants are the natural parents of three boys, Matthew, Greg, and Adam, now ages nineteen, fourteen and ten respectively. The youngest, Adam, was developmentally unremarkable until the age of two and one-half; at that point, he began to become behaviorally unmanageable. Over the next two years, appellants sought help for Adam with a myriad of psychological and psychiatric counseling agencies. These contacts resulted in little success in controlling Adam's violent behavior.
In 1993, the family became involved with appellee, Lucas County Children Services Board. In 1994, it was disclosed that in December 1993, both Adam and Gregory had been sexually abused by one of Matthew's adolescent acquaintances. The acquaintance was prosecuted and the family was referred to a sexual abuse counseling program. Ultimately, the family chose to continue treatment with their regular counselor.
The event which eventually precipitated the removal of Adam and Gregory from the home occurred on July 22, 1994. According to appellants, Adam went into to a violent rage when told to stop playing outside and come in the house. When Adam broke a second story closet window and tried to climb out, Toledo Police were summoned for assistance. According to appellants, the responding police sergeant told them that Adam should be restrained for his safety and that of others. Appellants insist, although the police sergeant denies it, that the officer told them to tie up Adam so that he would not hurt himself.
When police responded to a second call at appellants' home the same evening, they found Adam on his bed bound with tape.[1] Adam was taken to a nearby hospital where he was treated for contusions and released to his parents. The following day, appellants called appellee to again seek help in controlling Adam's behavior. Appellee dispatched a caseworker who reported finding appellant mother spanking Adam with a flyswatter. The caseworker reportedly counseled appellants on behavior management techniques which did not utilize corporal punishment. Five days later, appellee obtained an ex parte order removing Adam from the home. A medical examination at that time revealed bruises of an unknown origin. Based on these facts, the agency filed a complaint alleging that all three children were abused, neglected or dependent. Appellee sought temporary custody of Adam and protective supervision over the other two boys. This complaint was later amended to include temporary custody for Gregory. Appellants eventually consented to a finding of abuse for Adam and Gregory and dependency for Matthew.
Adam and Gregory were both placed in "therapeutic" foster homes. Collectively and individually, the family members were enrolled in various evaluation, counseling and therapy programs. Adam attended sexual abuse group therapy sessions, the purpose of which was to help him deal with the sexual abuse he received at the hands of his brother's adolescent acquaintance. In the course of this therapy, Adam "disclosed" that his brother Matthew had also participated in sexual contact involving both Gregory and Adam.
Meanwhile, Adam continued to "act out." He was moved from one therapeutic foster home to another. His second foster mother described some of his early behavior there. She reported that she took Adam to one of her favorite Chinese restaurants at which the two of them became engaged in a dispute over whether Adam would use a napkin. According to the foster mother, the six-year-old,
 "* * * went off, `You B-I-T-C-H, you A-S-S-H-O-L-E . . .' I'm spelling the words but he was saying them. He — it was all the condiments there, the spoons, forks, knives went all over the restaurant. People was hitting the deck.
 "And I had to literally pick him up with him kicking and things and I remember the people, the lady who runs the restaurant, Barbara, is good to her kids. He told her, `Shut up, B-I-T-C-H, you A-S-S-H-O-L-E, I wasn't talking to you. I'm talking to this B-I-T-C-H.'
 "So I got him in the car, he kicked had [sic] my car door, spit in my face. I got kicked in the stomach. I'm out in the parking lot trying to hold him down in the back seat of the car and people trying to peer in the car — I work for CSB if you have a problem call the police."
Adam's behavior lapses continued to one degree or another at his foster home, in school, and during visitation with his parents. The incidents intensified near the end of the visits.[2] Throughout, the cause of Adam's behavioral problem has defied explanation. Prior to appellee's involvement, Adam was diagnosed with attention deficit hyperactivity disorder and treated with Ritalin. Immediately after his removal from the home and the disclosure of the physical abuse charges, Adam was diagnosed with post traumatic stress syndrome and antidepressants were prescribed. The most recent psychiatric opinion is that Adam is bipolar.
When Adam was first removed from the home, appellee filed a case plan with family reunification as the ultimate goal. Appellee provided various therapeutic services for the family. Therapists reported that the family fully cooperated. This was true until Adam's disclosure of sexual conduct purportedly initiated by his older bother Matthew.[3] Matthew denied any such contact and became uncooperative in therapy, which was directed toward him as a sexual offender.
Appellants, who had accepted that Adam had been sexually abused by someone outside the family, were less willing to embrace the possibility that Matthew, too, was guilty of sexually abusing Adam. They conceded that it could have happened, but demanded more than a single allegation from Adam as proof. This led to something of a power struggle between appellants and appellee's caseworker. The caseworker and the foster mother alleged that appellants interfered with Adam's therapy by encouraging Adam not to talk about the sexual abuse allegations. Appellee sought to stop the interference by restricting, and eventually eliminating, appellants' visitation with Adam.
At some point, appellee's caseworker came to believe that appellants were not capable of learning the skills necessary to control Adam. Over appellants' objection, the agency sought to place Adam with an out of state relative. When this plan failed, appellee moved for the termination of appellants' parental rights and an award of permanent custody to appellee.
At the termination hearing, appellee conceded that appellants fully cooperated with the services provided and loved Adam a great deal. Appellee, nevertheless, argued that Adam's problems were so severe that, "* * * none but the cream of the crop * * * of a parent is going to be able to handle this child's problems." According to appellee, appellants, "* * * despite their cooperation in services, despite their love for this child, they do not have what it takes to parent this child."
Appellee presented testimony from Adam's foster mother, one of his therapists and the family's caseworker. The foster mother testified to Adam's behavioral problems and her own need to restrain him for as much as ten minutes to prevent him from injuring himself or others. The foster mother was of the opinion that she could anticipate and diffuse Adam's rages — a trait that, according to her, appellants had not mastered. On cross-examination, she conceded that "Adam makes no bones about wanting to go home to his parents." The foster mother also testified that she had no intention to adopt Adam.
The clinical therapist testified that while in the "sexual abuse treatment" group, Adam disclosed that his "older brother had tried to make him suck his penis." Adam later recanted the allegation, then refused to talk about it. The therapist blamed this later reticence on appellants' influence over Adam.
Adam's social worker testified that although appellants complied with the case plan, they were reluctant to believe that their oldest child was a sexual abuser. For Matthew's part, he denied the allegations and showed little cooperation to being treated as a sexual offender. The caseworker testified that she was recommending termination of the parents' rights because, "[w]e have a special needs child and I have special needs parents," who do not believe sexual abuse occurred and who are not capable of controlling Adam's behavior.
Following the hearing, the trial court found that despite appellee's diligent efforts, appellants failed to remedy the problems which caused the child to be placed outside the home. It concluded that Adam cannot and should not be reunited with his family and that a grant of permanent custody to appellee was in Adam's best interest.
Following this judgment, appellants filed a notice of appeal. Before this court, appellants' counsel sought leave to supplement the record with material which had not been before the trial court for the purpose of demonstrating that appellants had been denied effective assistance of counsel. We denied the motion to directly supplement the record, but granted appellants' motion for a remand of the case so that the trial court might consider a Civ.R. 60(B) motion based on the same material. The trial court considered the motion and the new material but, nonetheless, denied appellants' plea for relief from judgment. Appellants also appealed that judgment, and we consolidated the two appeals.
Appellants set forth the following three assignments of error:
 "I. THE TRIAL COURT ERRED TO APPELLANTS' PREJUDICE BY GRANTING TERMINATION OF PARENTAL RIGHTS, IN VIOLATION OF THE RULE IN AMANDA W.
 "II. APPELLANTS WERE DENIED DUE PROCESS WHERE THEIR MENTAL CONDITION WAS AT ISSUE
 "III. APPELLANTS WERE DENIED EFFECTIVE ASSISTANCE OF COUNSEL"
In their first assignment of error, appellants complain that the trial court erroneously terminated their parental rights.
We begin our analysis by recognizing the unique sanctity that our culture and our law places on the parent/child relationship. In re Sarah (Dec. 16, 1994), Lucas App. No. L-94-116, unreported. "The rights to conceive and raise one's children have been deemed `essential,' `basic civil rights of man,' and `rights far more precious * * * than property rights.' It is cardinal that the custody, care and nurture of the child reside first in the parents * * *." Stanley v. Illinois (1972),405 U.S. 645, 651. A parent's rights to the custody of his or her child has been characterized as "paramount," In re Hayes (1997), 79 Ohio St.3d 46,48, citing In re Perales (1977), 52 Ohio St.2d 89, 97, and the termination of these rights has been described as "the family law equivalent of the death penalty in a criminal case." Id. quoting In re Smith (1991), 77 Ohio App.3d 1,16. These considerations demand that judicial decisions to terminate parental rights receive careful scrutiny and that the permanent removal of a child from his or her family be condoned, "* * * only where there is demonstrated an incapacity on the part of the parent to provide adequate parental care, not [because] better parental care * * * can be provided by foster parents or adoptive parents * * *." In re Lay (1987), 43 Ohio App.3d 78, 82; see, also,In re William S. (1996), 75 Ohio St.3d 95, 97; R.C. 2151.01(C).
The right of the family to remain intact obtains constitutional protection. Stanley v. Illinois, supra, at 651. Before any court may consider whether a child's best interests may be served by permanent removal from his or her family, there must be first a demonstration that the parents are "unfit." Quilloin v.Walcott (1978), 434 U.S. 246, 255; see, also, In re Schoeppner
(1976), 46 Ohio St.2d 21, 24.
When a child is not abandoned or orphaned, the Ohio equivalent of parental unfitness is a statutory determination that he or she, "* * * cannot be placed with either of his parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(E) (1), In re Sarah H., supra. R.C.2151.414(E) directs that this threshold conclusion may only be entered if, following a hearing, the court concludes that there is clear and convincing evidence that one of the twelve predicate conditions enumerated in R.C. 2151.414(E) (1)-(12) exists. See,In re William S., supra, syllabus. Once this finding is properly entered, the court must then determine whether terminating a parent's parental rights is in the child's best interests. R.C.2151.414(D).
In this case, the court relied on a single R.C.2151.414(E) factor to support its conclusion that Adam cannot or should not be placed with his parents. The court found
 "* * * that pursuant to ORC 2151.414, that following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parents have failed continuously and repeated to substantially remedy the conditions causing the children [sic] to be placed outside the child's home."[4]
Our analysis of this finding requires that we (1) determine the specific reason why the child was placed outside the home, then (2) examine the efforts of the public children services agency to remedy the problem that caused removal, and (3) survey the record to determine whether there was clear and convincing evidence presented demonstrating that the parents failed continuously and repeatedly for a period of six months to substantially remedy the conditions causing removal. In reMcCormick (Aug. 28, 1992), Erie App. No. E-91-79, unreported.
The complaint associated with a child's removal from the home is an appropriate indicator of the reasons for the child's removal. In re William S., supra, at 100; In reMcCormick, supra; In re Sarah H., supra. In this matter, the original complaint of August 1, 1994, referenced the sexual victimization of Adam and Gregory in December 1993 by an adolescent offender from outside the home. The complaint further alleged that immediately prior to his removal from the home, Adam was found, "* * * physically restrained with tape and locked in his room." Additionally, the complaint alleged that Adam's mother had been "* * * spanking the child with a flyswatter." An amended complaint, filed August 12, 1994, adds that Adam "* * * disclosed that both he and his brother Greg were sexually abused by their older brother, Matthew [,] and a friend * * *."
In order to sustain the trial court's conclusion that within a reasonable period of time Adam cannot and should not be placed with his parents, the record must contain clear and convincing evidence that appellants, with the diligent assistance of appellee, failed to substantially remedy these conditions. Clear and convincing evidence is the highest level of evidentiary support necessary in a civil matter and has been defined as more than a mere preponderance of the evidence, but evidence sufficient to establish in the mind of the trier of fact a "firm belief or conviction as to the facts sought to be established." In reMcCormick, supra, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
In analyzing the December 1993 allegation of sexual misconduct by an adolescent from outside the home, we note that the complaint itself states that this individual was prosecuted. This action was apparently initiated by appellants prior to appellee's removal of Adam from the home. As a result, this allegation does not serve as a real basis for Adam's removal. In any event, any threat this individual may have posed to Adam's welfare now has dissipated. Therefore, there is no evidence that the parents failed to substantially remedy this problem subsequent to Adam's removal from the home.
Neither is Adam's allegation of sexual misconduct by his oldest brother supported by the evidence as an unresolved problem. In fact, other than Adam's one time disclosure that Matthew abused him, there is no evidence to support such an assertion. Matthew denies the charge and Adam's therapist testified that Adam made the allegation once, then recanted, then refused to discuss the issue further.
Appellee contends that because appellants refused to believe Adam's assertion that they are incapable of protecting him from further abuse. This misstates appellants' position. Appellants' position has consistently been to question the allegation, absent other proof. In any event, it is undisputed that Matthew is now nineteen, emancipated and living outside the home. Therefore, there is no evidence that appellants failed to remedy this problem after Adam's removal from the home.
Finally, there are the tape and flyswatter episodes. A number of things are undisputed here. The most significant of these is that when Adam "acts out," he is extremely violent and presents a threat to himself and others. His therapeutic foster mother testified that when Adam was in such a state he needed to be restrained — held down — for as much as ten minutes until his rage subsides. Additionally, according to the foster mother, Adam is a "head banger," meaning that while he is being restrained he must be prevented from beating his head against the floor. Therefore, the evidence is uncontested that on occasion Adam must be restrained.
It is also uncontroverted that on the evening in question appellants taped Adam's arms and legs not for punishment, but for the purpose of preventing him from injuring himself, as he had earlier broken a window in an attempt to crawl out onto the second story of the home.[5] On this issue of proper restraint and appropriate discipline, it is uncontroverted that appellants fully complied with the case plan and initially received glowing reports of progress from the therapists. However, appellants' caseworker testified that she made a conscious decision not to teach appellants restraint techniques, in essence, because she did not believe appellants were bright enough to use the restraints wisely.[6]
We find it peculiar, to say the least, that when proper restraints are the issue, appellee would choose not to teach appellants how to use proper restraints. Despite this failure, it is uncontroverted that appellants now recognize that using tape to restrain Adam is inappropriate. This constitutes a substantial remedy for the reason why Adam was removed from the home.
In our view, the flyswatter issue is a make weight argument. As appellants' point out, when certain types of corporal punishment are considered appropriate, the use of a flyswatter for spanking is not the kind of abuse that contemplates a loss of parental rights. As to appellee's assertion that the flyswatter left welts on Adam, this is not supported by the record.
Our examination of the record reveals that the trial court's conclusion that appellants failed to substantially remedy the problems which caused their child to be removed from the home is not supported by clear and convincing evidence. Accordingly, appellants' general assertion that the trial court erred in terminating their parental rights found in their first assignment of error is well-taken. Because of this conclusion, we need not reach the specific assertion of error in the first assignment of error, nor the remaining assignments of error which are found moot.
On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion. Costs to appellee.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ Melvin L. Resnick, J. JUDGE
 _______________________________ James R. Sherck, J. JUDGE
 _______________________________ Mark L. Pietrykowski, J. JUDGE
CONCUR.
[1] Appellants later pled no contest to a misdemeanor child endangering charge arising out of the incident.
[2] Each party puts his own spin on the timing of this "acting out." Appellee suggests that the episodes were triggered by appellants' inartful handling of Adam during visitation. Appellants suggest this shows Adam's desire to remain with his parents and not return to his foster home. It is undisputed that upon his discovery that Greg was to be reunited with the family before Adam, Adam's "acting out" flared.
[3] This was apparently an anticipated development. An unsigned 1995 memorandum introduced during the Civ.R. 60(B) proceedings states of Adam, "Well, well, well * * * boy did he spill the beans * * *." The memorandum says that, according to Adam, "* * * low and behold * * * touching oral sex occur all the time — he remembers when he was, 3, 4, 5, 6."
[4] The court's finding parallels the language of R.C.2151.414(E) (1) which provides:
 "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
[5] There is a discrepancy in the description of the taping. Appellee repeatedly refers to the tape as duct tape. Appellants deny that the tape was duct tape. In fact, they insist, they had protected Adam's skin from the tape by first wrapping washcloths around his arms and legs. The blood police saw that night, as indicated in the amended complaint, was from Adam's loose tooth. Moreover, it was never alleged that the bruises found on Adam's body had been caused by appellants.
[6] Throughout these proceedings, counsel for appellee has referred to this case as that of a "special child with special parents." In fact, the intelligence tests introduced in the case indicate that appellants both function in the low average IQ range. No evidence was presented that appellants suffer any special impairment.